# In the United States Court of Federal Claims

No. 14-242C
(Filed: April 29, 2016)

|  |  |  |
|---|---|---|
| CFS INTERNATIONAL CAPITAL CORPORATION, | ) ) ) |  |
|  | ) | Breach of Contract; Assignment |
| Plaintiff, | ) | Agreement; Export-Import Bank; |
|  | ) | Motion for Summary Judgment |
| v. | ) |  |
|  | ) |  |
| THE UNITED STATES, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

*Chrys D. Lemon*, Washington, DC, for plaintiff.

*David A. Levitt*, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, Commercial Litigation Branch, and *Steven J. Gillingham*, Assistant Director, Commercial Litigation Branch, for defendant. *Marina Braginskaya*, Export-Import Bank of the United States, Washington, DC, of counsel.

## OPINION GRANTING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

**FIRESTONE**, *Senior Judge*.

Pending before the court are the parties' cross-motions for summary judgment

under Rule 56 of the Rules of the Court of Federal Claims ("RCFC") in this breach of

contract case. At issue is whether the plaintiff, CFS International Capital Corporation

("CFS" or "plaintiff") is entitled to the proceeds of an insurance policy issued by

defendant the United States, through the Export-Import Bank of the United States ("Ex-

Im Bank" or "government" or "defendant"), to TopMeat Trading, LLC ("TopMeat"), an

exporter who had assigned the proceeds of its insurance policy to CFS.  CFS provided

financing to TopMeat's export of frozen foods from the U.S. to Mexico, and as a

condition of the financing agreement between CFS and TopMeat, TopMeat purchased an

insurance policy from the Ex-Im Bank, Pl.'s App'x 112-22; Def.'s App'x 9-24 ("the

Policy").  TopMeat then, with the Ex-Im Bank's permission, assigned the proceeds of

that policy to CFS via an Enhanced Assignment.  Pl.'s App'x 135-38; Def.'s App'x. 1-4

("the Assignment").

 The Policy allowed TopMeat to make a claim if the Mexican buyers defaulted on

their payments.  When the Mexican buyers allegedly failed to pay TopMeat, TopMeat

made a claim under the Policy, which the Ex-Im Bank denied.  CFS then filed a claim

under the Assignment, which the Ex-Im Bank also denied.  Thereafter, CFS filed this

breach of contract case.

 The government moved to dismiss CFS's complaint for failure to state a claim

under RCFC 12(b)(6), arguing that CFS could not recover under the Assignment because

CFS did not have an international bill of lading showing the delivery of the goods in

Mexico.  The court denied the government's motion to dismiss.  <u>CFS Int'l Capital Corp.

v. United States</u>, 118 Fed. Cl. 694 (2014).  The Assignment states that in order to recover,

the assignee (i.e., CFS) must to provide a "bill of lading (or other shipping documents)

identifying the Insured and the Buyer and evidencing the export of the products shipped .

. . ." Assignment § C.2.c.  Similarly, the Policy generally required the insured (i.e.,

TopMeat) to demonstrate "an export sale evidenced by a bill(s) of lading or other

shipping document(s) showing shipment of the <u>products</u> from the United States . . . to the

buyer in the buyer's country. . . ."  Policy § III.E (emphasis in original).  However, the

Policy contains a special provision regarding the shipment of goods to Canada and

Mexico.  This clause states that the insured may recover so long as it can present

documents showing that the goods were delivered to a location on the U.S. side of the

Mexican border, per the buyer's instructions, for transport over the border by the buyer or

the buyer's agent.

Though the Assignment does not contain an explicit provision dealing with

exports to Canada and Mexico, the court found that because the Policy and the

Assignment are so closely interrelated, the two contracts must be read together in a

manner that avoids contradictions or inconsistencies between the two agreements.  Id. at

699-700.  In this connection, the court ruled that while the language of the Assignment

was not necessarily ambiguous, CFS would be permitted to show on summary judgment

or at trial that the shipping documents it presented to the Ex-Im Bank were "evidence of

export" for those engaged in the business or industry of exporting goods to Mexico.  Id.[1]

After the court issued its ruling on the government's motion to dismiss, the parties

engaged in discovery and filed cross-motions for summary judgment.  Oral argument was

held on April 11, 2016.

For the reasons that follow, the court finds that CFS is entitled to summary

judgment.  Accordingly, CFS's motion for summary judgment, ECF No. 34 ("Pl.'s

---

[1] The court did, however, grant the government's motion to dismiss with respect to CFS's claim
for breach of the covenant of good faith and fair dealing, finding that this claim was redundant in
light of CFS's claim for breach of contract, which was premised upon the same facts.  CFS, 118
Fed. Cl. 700-01.

MSJ"), is **GRANTED**.  The government's cross motion for summary judgment, ECF No. 35 ("Def.'s MSJ"), is **DENIED**.

## I.      BACKGROUND

The relevant facts, as recited below, are not in dispute unless expressly noted.

### A.      The Enhanced Assignment and the Policy

The Ex-Im Bank is an independent federal agency that was established "to facilitate exports of goods and services . . . and in so doing to contribute to the employment of United States workers."  12 U.S.C. § 635(a)(1).  Among other programs, the Ex-Im Bank offers export credit insurance policies that provide coverage to U.S. exporters if a foreign buyer defaults on payment.  See generally Export Credit Insurance Program, http://www.exportim.gov/what-we-do/export-credit-insurance (last visited Feb. 10, 2016).

CFS is a California corporation that routinely finances small business exports to Mexico.  Clumeck Decl., Pl.'s App'x 45.  In 2011, CFS financed TopMeat's export of five shipments of frozen foods, by truck, from the U.S. to four buyers in Mexico.  Id.; see TopMeat Transaction Docs., Pl.'s Ex. C 48, 57, 70, 79, 90.  The loan was for $135,000 at an annual interest rate of 7 percent.  Clumeck Decl., Pl.'s App'x 45; see Secured Promissory Note, Pl.'s App'x 108.

As a condition of the financing, CFS required TopMeat to purchase an export credit insurance policy from the Ex-Im Bank and to assign the proceeds of the policy to CFS.  Clumeck Dep. 13:12-14, Pl.'s App'x 8.  TopMeat purchased such a policy in July of 2011.  See Policy & 2011 Decls., Pl.'s App'x 112, 123; Def.'s App'x 9-24. The Policy

4

provides that the Ex-Im Bank will cover 95% of TopMeat's losses if a foreign buyer defaults on payment for TopMeat's products.  See id.  In April of 2012, TopMeat and the Ex-Im Bank executed an agreement assigning the proceeds of the Policy to CFS, and in July of 2012, the Policy and the Assignment were both renewed for another year.

In order to recover on the Policy in the event of a buyer's default, an insured is ordinarily required, among other things, to provide "bill of lading(s) or other shipping document(s) showing shipment of the products from the United States . . . to the buyer in the buyer's country. . . . "  Policy § III.E.  These documents "must be issued by an unaffiliated third party."  Id.  However, the Policy treats exports of goods to Canada and Mexico differently from exports to all other countries:

> Notwithstanding the foregoing requirement with respect to shipping documents:  . . . if the *buyer's* country is either Mexico or Canada, *you* [TopMeat, the insured exporter] may ship to a point in the United States from which, to the best of *your* knowledge, the *products* are intended for ultimate delivery to Mexico or Canada, respectively, provided that: (1) *you* have written instructions from the *buyer* directing delivery to the *buyer* or the designated agent of the *buyer* at named point in the United States and (ii) *your* shipping document(s) evidence delivery to the point in the United States specified in the written instructions.

Id. at § III.E.3 (emphasis in original).

The parties agree based on the foregoing language that the Policy provides that when making a claim for an export to Canada or Mexico, the exporter need only submit its own documents showing that the goods were shipped to a point within the U.S. from where the goods would then be exported to Canada or Mexico at the buyer's direction. Id.

5

The parties also agree that an assignee is able to recover under the Assignment even if the Policy would preclude the insured from recovering under the same facts.  The Assignment states that the Ex-Im Bank agrees to pay the assignee 95% of the amount due under the policy "regardless of the Insured's performance under the Policy."  Assignment § D.1.[2]  Thus, even though the insured cannot collect under the Policy when the insured submits a fraudulent claim, Policy § IX.F, the assignee may still collect provided that "[t]he Assignee has complied with all of its obligations under this Agreement." Assignment § D.1.a.

To recover under the Assignment, the assignee must produce a "bill of lading (or other shipping documents) identifying the Insured and the Buyer and evidencing the export of the products shipped . . . ."  Assignment § C.2.c.  The Assignment does not contain the requirement of Policy § 3.E that these documents be issued by an unaffiliated third party.  The Assignment also does not contain any express language regarding shipments to Mexico and Canada as appears in the Policy.  The Assignment further provides that New York law governs the construction of its terms.  See Assignment § G.6.

**B.     The Ex-Im Bank's Denial of CFS's Claims**

In May, June, and July of 2012, TopMeat entered into agreements with four Mexican buyers to export frozen foods to Mexico.  See TopMeat Transaction Docs., Pl.'s App'x 48, 57, 70, 79, 90.  The buyers provided TopMeat with instructions to deliver each

---

[2] If the insured has complied with the terms of the Policy, the Ex-Im Bank agrees to pay the assignee the full amount that would be due to the insured under the policy.  Id. at § E.1.

shipment to the buyer's agent, a freight forwarder, in the border towns of McAllen or

Hidalgo, Texas.  Id. at 49, 58, 71, 80, 89.  Each of the shipments were transported to the

U.S. side of the border and turned over to the freight forwarder.  Id. at 50, 53, 63-65, 75-

76, 81-83, 92, 95.  The freight forwarder provided written statements that it would

transport the goods across the border.  Id. at 50, 53, 63-65, 75-76, 81-83, 92, 95.  CFS

states that it has no knowledge of what happened to the goods after they were turned over

to the freight forwarder.  Clumeck Decl., Pl.'s App'x 45.

Between October of 2012 and January of 2013, TopMeat filed claims with the Ex-

Im Bank under the Policy asserting that the four Mexican buyers defaulted on their

payments.[3]  To support each claim, TopMeat provided the following documents: (1) a

purchase order confirmation that the buyer purchased the goods from TopMeat; (2) an

invoice purporting to show the amount the buyer owed TopMeat for the goods; (3) a bill

of lading purporting to show the shipment of the goods by truck to the buyer's agent at a

point on the U.S. side of the U.S.-Mexico border; and (4) a receipt from the buyer's agent

(a freight forwarder) acknowledging receipt of the goods in the U.S., and stating that it

would ship the goods to the buyer in Mexico within 60 days.  See Def. App'x 104-125.

The Ex-Im Bank investigated TopMeat's claims and, with respect to one claim,

found that the putative buyer, Empacadora, had never ordered the goods.  Def.'s Resp. to

Int. 8, Def.'s App'x 46-47.  As a result, the Ex-Im Bank denied all four claims.  Policy

---

[3]   The alleged Mexican buyers were: Agrocarnica de Mexico S.A. de C.V. ($22,800), Pl.'s
App'x 48;  Empacadora del Noreste S.A. de C.V. ($27,506.54), id. at 57; Comercializadora
Agricola y Pecuaria La Choca S.A. de C.V. ($26,400), id. at 70; and Empacadora Ganadera de
Chihuahua S.A. de C.V. ($19,800), id. at 90.

Denial Letter, Pl.'s App'x 371-72.  The Ex-Im Bank also denied CFS's claims under the Assignment, stating that CFS "was not able to provide a bill of lading evidencing the export of the products shipped."  Id. at 371.  The Ex-Im Bank found that the shipping documents submitted by TopMeat and relied upon by CFS "provided only evidence of shipment to Hidalgo or McAllen, Texas, respectively."  Id.  CFS appealed the initial denial to Ex-Im Bank's Claims Reconsideration Committee, and the Committee upheld the Ex-Im Bank's decision to deny the claim in a letter issued September 27, 2013.  See Assignment Denial Letter to CFS, Pl.'s App'x 401-02.

###### C.   Evidence of Industry Custom and Practice

In accordance with the court's rulings in denying the government's motion to dismiss, CFS has presented the testimony of Frederico Zuniga, a U.S. Licensed Customs Broker since 1986, who states in his uncontested expert report that, when goods are shipped to Mexico by truck, U.S. trucking companies typically deliver products to a freight forwarder on the U.S. side of the border rather than ship the goods across the border using an international bill of lading.  Zuniga Report, Pl.'s App'x 167.  Mr. Zuniga explained that it is the job of the freight forwarder to transport the goods the short distance across the border, where the goods are then transferred to a Mexican shipping company that delivers the goods to the buyer.   Id. at 169-70.  According to Mr. Zuniga,

no international bill of lading or other international shipping documents are produced in this process.  Id.[4]

The government's experts confirmed that this method of bringing goods to the U.S. border and then using freight forwarders to carry the goods across to Mexico, known as "drop shipping," is typical for exports to Mexico.  Amy Hatfield, a branch chief in the Department of Homeland Security, Customs and Border Protection, testified that "almost 100 percent" of goods trucked from the U.S. to Mexico are drop-shipped in this manner on the U.S. side of the border.  Hatfield Dep. 24:13-25:15, Pl.'s App'x 185-86.  The government's other expert, Paul Jarzombek, the Chief Operating Officer for LR International Inc. with over 25 years of international logistics experience, Jarzombek Report, Def.'s App'x 83, testified that approximately 80 percent of shipments to Mexico involved drop shipments, Jarzombek Dep. 27:1-17, Def.'s App'x 81.

The government and the plaintiffs also agreed as to the reasons for this practice. Ms. Hatfield explained that "U.S. drivers are not insured based on U.S. insurance policies to drive their vehicles into Mexico. . . . [I]f you want to drive your vehicle into Mexico, you have to have a separate insurance policy, and it's typically quite expensive, because of the risk concerns."  Hatfield Dep. 23:6-17, Pl.'s App'x 185.  Ms. Hatfield further testified that "the freight forwarders are working on behalf of Mexican brokers to make sure that the paperwork that's being filed for the importation into Mexico is accurate in

---

[4] The freight forwarding system does produce a Mexican import customs document known as a pedimento.  Id. at 170.  However, the Ex-Im Bank does not accept a pedimento as a shipping document.  Conant Dep. 69:22-25, Pl.'s App'x 291.

order for the Mexican brokers to not face any penalties, . . . criminal charges, things like

that." Id. at 23:18-24:4.  Mr. Zuniga also explained that this procedure is followed

because there is "no bonding requirement for importations into Mexico, and the Mexican

broker assumes the liability for the declarations in Mexico."  Zuniga Dep. 13:21-25, Pl.'s

App'x 146.  He also explained that in order to import goods into Mexico, an entity must

have a Mexican tax identification number and be registered with Mexican Customs.  Id.

at 18:24-19:2.

Although the parties agreed that an international bill of lading would not ordinarily

be produced for a truck shipment to Mexico, Mr. Jarzombek, on behalf of the

government, testified that it would be "reasonable to expect an insured exporter to

produce a bill of lading or other documents evidencing export" and asserts that "bills of

lading or equivalent shipping documents are readily available."  Jarzombek Report,

Def.'s App'x 85.  Mr. Jarzombek does note, however, that when attempting to obtain a

bill of lading, "special care should be taken as most Mexic[an] Importers prefer to control

the cross-border transport and therefore insist on" a drop-shipped import.  Id. at 84.

## II.    STANDARD OF REVIEW

Under RCFC 56(a), "summary judgment is appropriate 'when there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"

BASR P'ship v. United States, 795 F.3d 1338, 1342 (Fed. Cir. 2015); see also Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A dispute is "genuine" when "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

<u>Anderson</u>, 477 U.S. at 248.  A fact is material if it could "affect the outcome of the suit under the governing law."  <u>Id.</u>

## III.   DISCUSSION

### A.   CFS's Obligations under the Policy Mirror TopMeat's Obligations under the Policy

The central issue in this case is whether the shipping documents CFS provided to the Ex-Im Bank satisfied the requirement for other shipping documents "evidencing export" within the meaning of the Assignment or whether, as the government argues, CFS's claim must fail because CFS does not have shipping documents showing that TopMeat's goods crossed into Mexico.  For the reasons stated below, the court agrees with CFS that the phrase "evidencing export" in the Assignment must be read together with and in accord with the Policy and therefore, with respect to goods shipped to Mexico, CFS met its burden by submitting the shipping documents identified in the Policy.  As such, CFS is entitled to recover under the Assignment.

### 1.   The Policy and the Assignment Must Be Read Together and in Accord with Each Other

CFS asserts that because the Assignment and Policy are so closely related, the two contracts must be read together and in such a way that avoids inconsistent obligations. Accordingly, CFS argues that it has met the Assignment's requirement that the insured must support its claim by providing documents "evidencing export" because, as the government does not dispute, those documents would be sufficient to support a claim under the Policy.  Specifically, CFS contends that because § III.E of the Policy states that, when exporting goods to Mexico, an exporter need not provide an international bill

of lading or other document showing the receipt of goods in Mexico to the Ex-Im Bank, the assignee of the Policy cannot be required to provide an international bill of lading or similar international shipping document under those same circumstances.  Instead, CFS argues, the same documentation needed to establish a claim under the Policy must apply to assignees under the Assignment.

The government counters that rather than looking to the Policy to define what type of documents are evidence of export, the court should look only to the dictionary definition of "evidence" and "export," and further argues that based on that definition, only a document reflecting the actual border crossing of goods into Mexico is sufficient to satisfy the Assignment.  In addition, the government argues that even if the Policy informs the Assignment, Policy § III.E provides an exception to the Policy's requirement that the insured provide evidence of export that does not apply to the assignee's corresponding requirement, which the government contends has no exception.

The court agrees with CFS that the Policy and the Assignment must be read together and that the shipping document requirements set in the Policy must inform the court's reading of the Assignment.[5]  This view is confirmed by New York law, which

---

[5] In its reply in support of its motion to dismiss, the government conceded that the Policy and the Assignment must be read together.  <u>See</u> Def.'s Reply in Support of Mot. to Dismiss at 8 n.4, ECF No. 11 ("Even though they are separate contracts, the Enhanced Assignment and Policy are clearly interconnected and, therefore, should be interpreted consistently with one another."). However, in its summary judgment briefing, the government contends that the Policy and the Assignment are not a "single agreement."  Def.'s MSJ 15.  The court does not read plaintiff's argument to be that the Policy and the Assignment are literally one contract; rather, they are a "related set of contracts" that, per New York law, "should be read as a whole and every effort should be made to give them consistent meaning in their overall context."  <u>Deutsche Alt-A Sec.</u>

governs the construction of the Assignment.  See Assignment § G.6.  Under New York law, "'all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties.'"  TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) (alteration in original) (quoting This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)).  TopMeat, the Ex-Im Bank, and CFS are all signatories to the Assignment.  The Assignment also refers to the Policy numerous times and relies on language in the Policy to establish and define key rights and obligations under the Assignment.[6]  Indeed, the obligations in the Assignment could not exist without the Policy.  See Genger v. Genger, 76 F. Supp. 3d 488, 497 (S.D.N.Y. 2015) (finding two contracts must be read together when "neither agreement makes any sense without the promises expressed in the other.").  Therefore, it is "both good sense and good law that these closely integrated and nearly contemporaneous documents be construed together."  See Prod. Res. Grp., L.L.C. v. Martin Prof'l, A/S, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012) (quoting Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) (internal quotation marks omitted)).

---

Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc., 958 F. Supp. 2d 488, 498 (S.D.N.Y. 2013).

[6] See, e.g., Assignment § B.1.a (the Policy holder agrees to submit to the assignee receivables that "arise out of an insured transaction as defined in the Policy"); id. at § C.1 (the assignee agrees to provide financing on shipments that occur "within the Policy Period"); id. at § D.1 (the Ex-Im Bank agrees to pay the assignee "regardless of the Insured's performance under the Policy").

The government argues that, even if the Policy and the Assignment are read together, Policy § III.E does not inform the meaning of the term "evidencing export" in the Assignment.  The government states that while the Assignment requires evidence of export in all circumstances, Policy § III.E creates an exception that the insured provide evidence of export requirement when exporting goods to Canada and Mexico that does not apply to the Assignment.

The court disagrees with the government's interpretation.  Section III.E of the Policy reads as follows:

[To be an insured transaction, e]ach shipment must be:

. . .

E. an export sale evidenced by a bill(s) of lading or other shipping document(s) showing shipment of the products from the United States (or its territories) to the buyer in the buyer's country, in all cases the shipping document(s) must be issued by an unaffiliated third party (unless otherwise approved in writing by Ex-Im Bank) and be consistent with the other documents evidencing a buyer obligation.  Notwithstanding the foregoing requirement with respect to shipping documents:

1. you may ship to a recipient that is not the buyer, but located in the buyer's country provided that you have written instructions from the buyer that specify the destination of the products and your shipping documents evidence delivery to the same destination specified in the written instructions; or

2. you may ship to a recipient that is not in the buyer's country (without prior written authorization from Ex-Im Bank), provided that: (i) you have written instructions from the buyer that specify the destination of the products and your shipping documents evidence delivery to the same destination specified in the written instructions and (ii) the destination country is listed on the Country Limitation Schedule as open in the category "Up to 1 Year" and there are no restrictions or footnotes identified in the "Note(s)" category; or

> 3. if the buyer's country is either Mexico or Canada, you may ship to
> a point in the United States from which, to the best of your
> knowledge, the products are intended for ultimate delivery to
> Mexico or Canada, respectively, provided that: (i) you have written
> instructions from the buyer directing delivery to the buyer or the
> designated agent of the buyer at the named point in the United States
> and (ii) your shipping document(s) evidence delivery to the point in
> the United States specified in the written instructions.

Policy § III.E (emphasis altered).  Under a straightforward reading of the contract, the

language "Notwithstanding the foregoing requirement with respect to shipping

documents" does not negate the Policy's requirement that the insured provide evidence of

"an export sale."  Instead, the "Notwithstanding" clause creates exceptions to the

requirement that the exporter provide a "bill(s) of lading or other shipping document(s)

showing shipment of the products from the United States (or its territories) to the buyer in

the buyer's country."  Policy § III.E.  A natural reading of the section as a whole

demonstrates that the Policy provides four acceptable methods of providing evidence of

export, depending on where and to whom the goods are exported.  In other words, the

Policy in all cases requires evidence of export, but in enumerated circumstances, the

shipping documents need not show a shipment from the U.S. directly to the buyer in the

buyer's country.  In the case of exports to Mexico, the evidence of export can consist of a

document showing that the goods were delivered to the buyer's agent and "intended for

ultimate delivery to Mexico . . . ."  Policy § III.E.3.  Therefore, the court agrees with CFS

that when the Policy and the Assignment are read together, the "only reasonable

interpretation for the phrase 'evidencing the export' in the Assignment is that it includes

any shipping document that evidences an export sale specified" in § III.E. of the Policy. Pl.'s Reply 8.

The court further agrees with CFS that, under New York law, the Assignment and the Policy must be read together and to avoid any inconsistency.  It is "black letter law that the provisions of a contract or a related set of contracts should be read as a whole and every effort should be made to give them consistent meaning in their overall context." Deutsche Alt-A Sec. Mortgage Loan Trust, Series 2006-OA1 v. DB Structured Products, Inc., 958 F. Supp. 2d 488, 498 (S.D.N.Y. 2013) (citing Perreca v. Gluck, 295 F.3d 215, 224 (2d Cir. 2002)).  Thus, when interpreting a "contract or multiple contracts in a transaction," the court must "strive to give effect to all of the terms of the relevant documents, reading them together."  Kelso Enters. Ltd. v. A.P. Moller–Maersk A/S, 375 F. App'x. 48, 49 (2d Cir. 2010) (summary order) (citing Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 111 (2d Cir. 2008)).

It is for this reason that government's contention that the court should not look to the Policy in construing the words "evidencing export" in the Assignment, on the grounds that these words have a plain meaning is not persuasive.  The government argues that when these words are defined using any dictionary, "evidencing export" plainly means that an assignee must have documents to show "the goods were being delivered to another country."  Def.'s MSJ 11.  The court finds this argument is overly simplistic. The critical question is what "shipping documents" can serve as evidence of export.  In this case, the court cannot ignore the fact that Policy § III.E.3 does not require documentation of actual border crossing and instead allows the insured to make a claim based on

16

delivery to a freight agent directed to take the goods across the border.  In determining

what evidence the assignee may use as "evidence of export," the court cannot ignore

what shipping documents the insured receives as part of the shipping process and needs

to present under the Policy.  Adopting the government's reasoning would create an

additional obligation on the assignee that is not required of the insured, the party in the

best position to obtain the documents the Ex-Im Bank needs.  The law of New York

instructs the court to avoid inconsistent obligations where possible.  See In re: Residential

Capital, LLC, 533 B.R. 379, 402 (Bankr. S.D.N.Y. 2015) ("New York law provides that a

court should construe a contract in a way that reasonably harmonizes its provisions and

avoids inconsistencies." (quoting U.S. Bank Tr. Nat'l Ass'n v. Am. Airlines, Inc. (In re

AMR Corp.), 485 B.R. 279, 303 (Bankr. S.D.N.Y. 2013)).

### 2.   The Government's Policy-Based Arguments do not Alter the Court's Interpretation of the Contract's Language

The government offers several reasons why its interpretation of the contract would

lead to a better outcome, none of which are persuasive.[7]  The government argues that

because § D.1 of the Assignment states that CFS can be compensated under the

assignment even if the insured does not comply with the Policy, "[i]t would make little

---

[7] The court recognizes that the parties have also presented conflicting parole evidence as to the parties' intent when drafting the contract, but finds that the language of the Policy read in light of industry practice, see Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 466 (2d Cir. 2010) (contract terms are interpreted from the point of view of a person "who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (quotations omitted)), answer the question in this case.  Therefore, the language of the Assignment is not ambiguous and the court will not consider parole evidence. See Toto, Inc. v. Sony Music Entm't, 60 F. Supp. 3d 407, 413 (S.D.N.Y. 2014).

sense to require that the Enhanced Assignee comply with all of its obligations if, in fact, its obligations were equivalent to the requirements imposed on the insured." Def.'s MSJ 13. According to the government, if the assignee had the same obligations as the insured, it would "render the requirement that the Enhanced Assignee comply with all of its obligations mere surplusage, and contradict the canon of construction requiring the contract to be interpreted so as to give meaning to all its words." Id. (citing Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 86 (2nd Cir. 2002) (courts should read contracts "to safeguard against adopting an interpretation that would render any individual provision superfluous")).

It makes little sense to suggest that the Assignment language is rendered meaningless by allowing CFS to rely on the same shipping documents that TopMeat received and was required to provide under the Policy. In order to recover, CFS must meet numerous requirements that do not apply to the insured. The assignee must provide financing to the insured, Assignment § C.1, notify the Ex-Im Bank of known financial difficulties on the part of the insured or discrepancies in the insured's documents, id. at § C.4, and must cooperate with the Ex-Im Bank to minimize losses, which may include initiating legal action, id. at C.6. In addition, as CFS notes,

> The obligations in the Policy are imposed on the insured. The obligations in the Assignment are imposed on the assignee. Thus, even if the obligations imposed on the insured and the assignee were the same, no surplusage would result because the obligations are imposed on different parties and all the obligations in both the Policy and Assignment would still have meaning.

Pl.'s Reply 13 (citing Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956)).  Therefore, the court finds, contrary to the government's contentions, that the fact that the Assignee is required to provide the same documentation of export as the insured does not make any portion of the Assignment redundant.

The court also must reject the government's policy argument that it is necessary for the government to require additional documents from CFS (the assignee) than it needed from TopMeat (the insured) because the Ex-Im Bank "incurs greater risks under the Enhanced Assignment program than it does under its insurance programs because Ex-Im Bank must pay the Enhanced Assignee who complies with the Enhanced Assignment Agreement (EA) irrespective of the insured's performance under the Policy."  Def.'s Reply 2.  That is because while the Policy prohibits the insured from collecting on the Policy if it commits fraud, see Policy § IX.F, the Assignment allows the assignee to collect even in cases of fraud on the part of the insured, see Assignment § D.1.a. However, if the Ex-Im Bank bears a greater risk under the Assignment, the government was aware of and agreed to assume that risk when it signed the contract.[8]  There is nothing in the Assignment to support the government's contention that the Assignment requires different documentation regarding "evidence of export" from assignees than it requires from those it insures in the first instance.  To the contrary, it appears that the Assignment contemplates, as discussed above, that the same documentation would be

---

[8]  The court understands that, after this case was filed, the Ex-Im Bank has amended Assignment agreement to now require an assignee to provide additional third-party documentation of shipment to Mexico beyond what is required in the Policy.  See Transcript of Oral Argument at 45, ECF No. 40.

used by both the insured and assignee.  The court will not alter the contractual

relationship between the parties by changing the meaning of contract terms to mitigate a

perceived risk to the government.

Finally, the court rejects the government's argument that if the phrase "evidencing

export" in the Assignment is construed to include documents demonstrating delivery to a

port city to be transported over the border to Canada or Mexico, then the Ex-Im Bank

will be required to accept those types of documents for exports anywhere in the world.

This is wholly unsupported. What may constitute "evidence of export" in one situation is

not necessarily "evidence of export" in every situation.  The Policy establishes what

documentation is necessary to evidence export.  The court's opinion in this case turns on

the language of the Policy specifically pertaining to exports to Mexico. The language of

the Policy with respect to exports to countries other than Mexico will govern the

documentation requirements for claims relating to exports to those countries.

### B.      CFS's Reading of the Assignment Language Is Consistent with Industry Custom and Practice

CFS argues that to the extent there is any doubt as to how the Assignment

language should be read, the court should accept CFS's reading and reject the

government's reading because only CFS's reading is consistent with industry custom and

practice.  CFS relies on the testimony of Mr. Zuniga, which is largely in concert with all

of the government's witnesses on the subject, to show that it is commonly understood

that an exporter to Mexico drop-ships its goods with a Mexican transporter at the border

because of the unique issues associated with shipping goods into and within Mexico.  As

such, CFS argues, it is not the industry custom or practice to obtain an international bill of lading for shipments into Mexico and thus it would be contrary to custom and practice for an exporter or export insurer to require one.

The government does not dispute any of the particulars of the plaintiff's evidence regarding industry custom and practice but instead argues that the court should not consider this type of evidence in interpreting the Assignment. First, the government argues that the term "evidencing export" is not a specialized term, and therefore the court need not look to trade custom and practice. Second, the government argues that while the plaintiff's expert has given testimony regarding the manner in which goods are typically exported to Mexico, he did not give any testimony regarding the meaning of the term "evidencing export," and thus his testimony does not inform the meaning of the term. Finally, the government argues that because it is possible to obtain international bills of lading for shipments to Mexico, the Ex-Im Bank could require them.

Although it is not necessary for the court to consider trade custom and usage in construing the meaning of the Assignment, the court agrees with CFS that to the extent trade custom and usage are relevant they support CFS's contention that shipping documents evidencing export do not ordinarily include international bills of lading. Thus, if the court were to adopt the government's interpretation of the Assignment language to require an international bill of lading or similar document for shipments to Mexico it would not be consistent with practice and thus contrary to New York law. Under New York law, "a 'contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the

parties.'"  Greenwich Capital Fin. Products, Inc. v. Negrin, 74 A.D.3d 413, 415, 903

N.Y.S.2d 346, 348 (2010) (quoting Matter of Lipper Holdings v. Trident Holdings, 1

A.D.3d 170, 171, 766 N.Y.S.2d 561 (2003)); see also Omni Berkshire Corp. v. Wells

Fargo Bank, N.A., 307 F. Supp. 2d 534, 541 (S.D.N.Y. 2004) (finding that the fact that

the parties did not specifically use language that deviated from the industry standard

"suggests that the parties intended to require only what the industry generally accepted.").

The court thus declines to adopt the government's reading when CFS's is consistent with

the text of the Policy and the Assignment and also in line with industry custom and

practice.[9]

## IV.   CONCLUSION

For the reasons stated above, the court **GRANTS** CFS's motion for summary

judgment and **DENIES** the government's cross-motion for summary judgment.

---

[9] The government's assumption that a term must be specialized or scientific is contradicted by
New York law.  A term that has "an apparently unambiguous meaning to lay persons may in fact
have a specialized meaning in a particular industry."  Sompo Japan Ins. Co. of Am. v. Norfolk S.
Ry. Co., 762 F.3d 165, 180 (2d Cir. 2014).  For example, in Little v. Landsman Development
Corp., the court rejected the defendant's "proposed generic definition of the term 'ramp,'" a term
that is by no means technical or scientific.  24 F. Supp. 3d 294, 298 (W.D.N.Y. 2014).  The court
in Little found that the word "'ramp has a commonly understood meaning in the construction and
building trade," which included "specifications for the width, length, and slope of such ramp, and
also requirements for the use of non-slip materials in the construction of the ramp and the
inclusion of handrails in certain cases."  Id.  In light of this understood meaning within the
industry, "there is no reason to substitute a generic, dictionary definition for the term" when
construing the word's meaning in the relevant contract.  Id.

Further, the court finds that the government's objection to the plaintiff's expert testimony on the
grounds that he did not expressly address the meaning of the words "evidencing export" is
without merit.  CFS's expert, along with the government's witnesses, provided the court with the
context for construing the types of documents that can "evidenc[e] export" in cases where
shipments are going to Canada or Mexico.

Accordingly, CFS shall provide the court with a proposed judgment for entry by the Clerk of Court by **Friday, May 20, 2016**.

      **IT IS SO ORDERED.**

s/Nancy B. Firestone_____
NANCY B. FIRESTONE
Senior Judge
